**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**JARROD BLACKWOOD, individually and on behalf**
**of a class of similarly situated individuals,**

**and**

**MEGAN BLACKWOOD, individually and on behalf**
**of a class of similarly situated individuals,**

**and**

**RYAN TAGG, individually and on behalf**
**of a class of similarly situated individuals,**

**and**

**CHRISTOPHER GAYLER, individually and on behalf**
**of a class of similarly situated individuals,**

**and**

**KEENAN ANGEL, individually and on behalf**
**of a class of similarly situated individuals,**

*Plaintiffs*,

v.                                                      Civil Action No. 3:20-cv-00444

**JOHN/JANE DOES 1-X,**                       **JURY TRIAL DEMANDED**
**in their personal capacities.**

*Defendants*.

## COMPLAINT

COMES NOW, the Plaintiffs Jarrod Blackwood, Megan Blackwood, Ryan Tagg,

Christopher Gayler, and Keenan Angel, by counsel, each individually and on behalf of a class of

similarly situated persons, and hereby files his Complaint against John/Jane Does 1-X ("the

Does"), and in support thereof, Plaintiff states as follows:

1

## INTRODUCTION

1.      This is class action. It arises from conduct of officers, employees, and agents of the Richmond City Police Department on Monday, June 1, 2020, between approximately 7:32 and 7:42 p.m. In particular, the officers, employees, and agents of the Richmond City Police Department used intentional, unjustified, and inexcusable force and threats of force to disperse citizens who had assembled near the Lee Memorial in Richmond, Virginia, to exercise their First Amendment rights through a peaceful demonstration—a demonstration protesting, *inter alia*, police violence, police militarization, the lack of police accountability, systemic racism in policing, and the extra-judicial killings by police of African-Americans. The protest arose in the aftermath of the murder of George Floyd by officers with the Minneapolis Police Department, but was directed in part against local injustices, including those perpetrated by the City of Richmond Police Department. The force and threats of force used by the police to disperse this assembly included but were not limited to training assault rifles and other firearms on the assembly, deploying tear gas and pepper spray against the assembly, use of batons, and marching with arms and armor through the assembly area.

2.      This suit brings claims for a violation of civil rights protected by the Constitution of the United States, as well as for state-law tort claims. The plaintiffs, individually and as members of a class of similarly situated individuals, seek declaratory relief, compensatory damages as well as punitive and exemplary damages for the defendants' violations of these Constitutional rights, and compensatory and punitive damages for the tortious conduct.

## VENUE AND JURSIDICTION

3.      This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. § 1331. This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§

2201 and 2202 and Federal Rule of Civil Procedure 57. This Court is authorized to treat this as a class action under Federal Rule of Civil Procedure 23.

4.     Venue is proper in the Richmond Division of the Eastern District of Virginia pursuant to 28 U.S.C. §§ 127, 1391 and Local Civil Rule 3, as a substantial part of the events giving rise to the claims herein occurred in the City of Richmond.

## PARTIES

5.     Plaintiffs Jarrod Blackwood, Megan Blackwood, Ryan Tagg, Christopher Gayler, and Keenan Angel are each citizens of the United States, and residents of Virginia, who participated in a demonstration on June 1, 2020, that culminated at the Lee Memorial, where it was dispersed by officers, agents, and employees of the Richmond Police Department between approximately 7:32 and 7:42 p.m. They sue individually and on behalf of a class of similarly situated individuals.

6.     The Plaintiff is currently unaware of the names and identities of defendant Does 1-X. Generally, however Doe Defendants 1-X may consist of the following persons:

    a.     Any officer, employee, or agent of the Richmond Police Department that took action, by openly training their firearms on the assembly, threatening the assembly at Lee Circle on June 1, 2020, between approximately 7:32 and 7:42 p.m. as described herein.

    b.     Any officer, employee, or agent of the Richmond Police Department that took action, by using their weapons or munitions, to disperse the assembly at Lee Circle on June 1, 2020, between approximately 7:32 and 7:42 p.m. as described herein.

c. Officers, employees, or agents of the Richmond Police Department that took action, by advancing through the grounds of the assembly while armed, to disperse the assembly at Lee Circle on June 1, 2020, between approximately 7:32 and 7:42 p.m. as described herein, after the initial assault of tear gas.

d. Officers, employees, or agents of the Richmond Police Department that were present and encouraged others to use violence or threats of violence to disperse the assembly at Lee Circle on June 1, 2020, between approximately 7:32 and 7:42 p.m. as described herein.

e. Officers, employees, or agents of the Richmond Police Department that knew or should have known that their fellow officers were violating, or were intending to violate, the constitutional rights of the members of assembly described herein, had reasonable opportunity to prevent the harm, and chose not to act to prevent the harm.

f. Supervisors and other agents of the Richmond Police Department of the foregoing Doe defendants who planned or authorized the conduct described herein.

g. Supervisors of the foregoing Doe defendants that had actual or constructive knowledge that their subordinate(s) were, or were intending, to engage in conduct that poses a pervasive and unreasonable risk of constitutional injury to citizens, and whose response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the conduct, which inaction was an affirmative cause of the constitutional injury.

7. The Plaintiff join their claims pursuant to Federal Rule of Civil Procedure 20, asserting claims severally, arising out of the same occurrence or series of occurrences. The

defendants are joined, pursuant to Federal Rule of Civil Procedure 20, as the claims against the

defendants arise from the same occurrence or series of occurrences.

## CLASSES

8.      The Plaintiffs are each a member of a general class of similarly situated

individuals, whose rights were similarly violated. The general class may be defined as:

> **Any individual, excluding on-duty law enforcement personnel, present at Lee Circle (to include the enclosed park, the street, and the immediately adjacent road verge and sidewalks) in Richmond, Virginia, on June 1, 2020, to engage in a protected, First Amendment activity, and who witnessed, and was injured by or threated by, the acts of violence or threats of violence perpetrated by Richmond Police officers, employees, or agents, at any time in the ten minute period beginning when Richmond Police openly trained firearms on the gathered assembly at approximately 7:32 p.m.**

While the exact numbers in this class are unknown, it is estimated to include several hundred to a

few thousand individuals.

9.      This class of individuals may be further subdivided into two subclasses for

purposes of the claims brought in this lawsuit:

> a.   **Subclass I -- Any class member that experienced an unwanted harmful or offensive physical contact (to include contact with a chemical irritant) with Richmond Police officers, employees, or agents, or their weapons or munitions, at the specified time and location. Ryan Tagg, Christopher Gayler, and Keenan Angel are representatives of this class.**

> b.   **Subclass II -- Those class members that did not experienced an unwanted harmful or offensive physical contact with Richmond Police officers, employees, or agents, or their weapons or munitions, at the specified time and location. Jarrod Blackwood and Megan Blackwood are representatives of this class.**

## FACTS

10.     On Monday, June 1, 2020, a large number of individuals initiated a peaceful assembly in Richmond, Virginia, in accordance with their rights enshrined in the First Amendment to the Constitution of the United States, in response to the extra-judicial killings of persons of color by American law enforcement, highlighted by the death of George Floyd, and in response to the excessive force that such American law enforcement has often deployed against its citizens. The Plaintiffs named herein were among those that participated in this assembly and demonstration.

11.     The assembly began at Monroe Park, The apparent organizers of the assembly took extraordinary, public steps, at the beginning and repeatedly throughout the course of the assembly, to help to ensure that this assembly and demonstration would be peaceful, nonviolent, and nondestructive of private or public property. The efforts included repeated, explicit direction during the public speeches of the nonviolent and nondestructive goals of the demonstration; use of self-policing to identify individuals that may become disorderly and addressing those concerns promptly; use of chants throughout the assembly to redirect emotions away from anger and toward nonviolence and nonaggression; making use of a police escort; and allowing police presence in and around the assembly. **E.g., Exhibit 1, 2:17-4:13**. The demonstrators of the assembly were in agreement with the nonviolent and nondestructive goals of the demonstration and complied with these directions. This all distinguished the assembly from the previous protests of Friday, May 29, and Saturday, May 30, 2020 that saw, *inter alia*, the Richmond Police Precinct vandalized.

12.     In the late afternoon of Monday, June 1, 2020, the assembly began its journey from Monroe Park to the Capitol. At no time during this movement was the assembly violent or

destructive of public or private property. It then returned to Monroe Park, and proceeded with a full police escort provided by the Richmond Police Department, along a route that Richmond Police Department had cleared for this purpose. **Exhibit 1, 5:34-6:25; Exhibit 2**.

13.    The assembly, with its Richmond Police Department escort, proceeded from Monroe Park along Grace Street, to Second Street, to Main Street, to Monroe Park, and then to Franklin Street and to the General J. E. B. Stuart monument.  This movement took approximately an hour, and at no time during this movement was the assembly violent or destructive of public or private property.  Along this route, the assembly was chanting, and some of these chants were explicitly anti-police and anti-Richmond Police Department, though they did not advocate violence.

14.    The assembly then congregated around the eastern side of the General J.E.B. Stuart monument to hear speakers discuss the issues of the day.  During this gathering around the General J.E.B. Stuart monument, the speakers reiterated that the assembly was to be non-violent and was not to destroy any property (private or public), and the assembly complied.  At no time did the assembly turn violent, threaten to turn violent or begin to destroy public or private property, and at no time did this assembly attempt to destroy, deface or harm the General J.E.B. Stuart monument.

15.    After approximately half an hour, the assembly, with their Richmond Police Department escorts, proceeded west on Monument Avenue approximately one quarter of a mile to the General Robert E. Lee memorial, on Lee Circle, where it again assembled on the east side of the General Robert E. Lee memorial to hear more speakers.  The assembly at the General Robert E. Lee memorial was peaceful, there were no threats of violence, and none of the assembly at the General Robert E. Lee memorial was destroying or attempting to destroy or

deface any public or private property or the General Robert E. Lee memorial. **Exhibit 3, 0:00-1:14.**

16.     At approximately 7:31 p.m.—that is, almost a full half hour prior to the curfew[1]—members of the Richmond Police Department, acting without provocation or warning, appeared in a convoy of vehicle, moving down Monument Avenue from the northwest, toward Lee Circle. They then established a skirmish line along the northwestern side of Lee Circle. This skirmish line was heavily armed and armored, wearing body armor and masks, and most had AR-style assault weapons and their side-arms. **Exhibit 3, 1:14-2:05; Exhibit 4, 0:00-2:00.**

17.     Beginning within a minute after arriving on the scene, and at approximately 7:32 a.m., several of the Richmond Police Department assumed aggressive shooting stances, and trained their rifles or sidearms in the assembly, causing many in the peaceful assembly that witnessed this to fear these armed individuals were about to fire upon them.



*From Exhibit 4, 0:26*



*From Exhibit 3, 1:24*

---

[1] The City of Richmond was, at this time, under a curfew prohibiting any person from being on "any street, road, alley, avenue, park, or other public place between the hours of 8:00 p.m. to 6:00 a.m. beginning May 31, 2020 and ending on June 3, 2020." <u>See</u>. Commonwealth of Virginia, Office of the Governor, Executive Order Number Sixty-Four (2020).

 

*From Exhibit 4, 1:15*

*From Exhibit 3, 2:20*

This threat of imminent physical injury cause some in the assembly to terminate their exercise of their First Amendment activities and depart the scene. Other members of the assembly, shocked at the sudden, unprovoked display of aggression by Richmond Police Department, which appeared to have led the assembly into the ambush, and recognizing the infringement of their rights, moved from the east side of the General Robert E. Lee memorial to the west side of the Robert E. Lee memorial, maintaining a safe and respectful distance of tens of yards from the Richmond Police skirmish line, and began to object to this excessive show of force, shouting that the assembly was and had been peaceful, that the curfew was not in effect for another half an hour, and chanting "Hands-up—Don't shoot," with arms raised to undeniably and visibly demonstrate the peaceful nature of the current protest and to show that the assembly was protesting but not threatening the officers. **Exhibit 3, 2:05-4:10; Exhibit 4, 1:00-3:08; Exhibit 5, 0:00-0:09; Exhibit 6, 0:00-0:04; Exhibit 7, 0:00-0:09; Exhibit 8.**

18.     About three minutes after the police began their deployment, an armored vehicle with additional armed and armored officers, employees, or agents of the Richmond Police, with

gas masks, body armor, and assault weapons, arrived from along the northeast side of the circle.
**Exhibit 3, 3:51-4:10; Exhibit 4, 2:45-3:10; Exhibit 7, 0:10-0:15; Exhibit 9.**

19.     About thirty seconds after the armored vehicle arrived, a gray pickup truck with
additional police arrived. As it did so, and without provocation or warning, a member of the
Richmond Police Department threw tear-gas canister into the assembly, quickly followed by
other officers, even as many of the assembly, particularly those in front, were kneeling with their
hands in the air chanting "hands-up don't shoot." Many remaining in the assembly were affected
by the tear gas, which causes severe irritation of the skin, eyes, mouth, throat, and lungs. Others,
feared injury from the police, including but not limited to the tear case. As a result, many in
assembly withdrew, terminating their exercise of their First Amendment rights. **Exhibit 3, 4:10-
4:47; Exhibit 4, 3:10-3:40; Exhibit 5, 0:09-0:57; Exhibit 6, 0:04-0:09; Exhibit 7, 0:27-1:00;
Exhibit 10.**

20.     During the three to four minutes since arriving, the police had adequate time to
assess the peaceful nature of this protest, to give directions or warnings to the assembly, and to
determined that any alleged illegal conduct, such as permanent damage to the statue, was not
occurring and had not in fact occurred. Further, if more time was needed, they could have taken
more time, as there was no emergent need to launch this attack.

21.     As canisters of tear gas continued to be deployed in Lee Circle, forcing those
remaining in the assembly to the perimeter, and providing thick, white, poisonous smoke as
coverage for the members of the Richmond Police Department, members of the Richmond Police
Department wearing gas masks stormed through Lee Circle attacking any remaining protesters,
used both OC pepper spray and batons. This action caused those remaining around the Robert E
Lee memorial and the adjacent area to disperse and to terminate their exercise of their First

Amendment Rights. Additionally, as the police moved into Lee Circle, other members of the Richmond Police Department on the east of Lee Circle also fired into the Circle. Within approximately two minutes of the initial assault with tear gas, Lee Circle was substantially cleared by the police of demonstrators. Gas was fired at the remnants of the assembly as it dispersed, as the police used a pursuit-by-fire tactic. **Exhibit 3, 4:47-6:20; Exhibit 4, 3:40-5:05; Exhibit 5, 0:57-1:37.**

22.     In launching the attacks from both the northwest and the east, the Richmond Police appeared to be using a variant on an L-shaped ambush tactic common in military conflicts around the world.  The use of an "L" ambush is a common military tactical maneuver designed and intended to trap the assembly in a "kill zone" and leave the ambushed with only two options: first, to be maximally exposed to the assault and the concomitant flanking and enfilading fire that the ambush provides; or second, to counter such a tactical maneuver by assaulting through the ambush established--that is, a frontal assault against one of the two legs of the "L" ambush to neutralize one of the fields of fire.  The tactic therefore seems designed to maximize the effect of the ambush when the law enforcement deployed violence, and even to encourage the assembly to become violent (which the assembly did not) as a means of excusing police retaliation.

23.     At no time prior to the ambush was the assembly at the Lee Circle violent. At no time prior to the ambush at the Lee Circle commit any property destruction.  At no time prior to the ambush did the assembly at the Lee Circle attempt to damage, deface, or destroy the memorial or other public or private property.

24.     On or around 8:11 p.m., after the ambush, and recognizing the grave illegality of their actions, the Richmond Police Department took to Twitter to begin a disinformation campaign to create a false narrative for the populations of Richmond, Virginia, the United States

and the world who were watching, alleging the Richmond Police Department was forced to gas the assembly at the General Robert E. Lee memorial because "some RPD officers in that area were cut off by violent protestors" and that the "gas was necessary to get them to safety." **Exhibit 11.**

25.     This tweet was patently false.  The assembly at Lee Circle was not violent, and the assembly was not cleared to allow RPD officers' a means of escape to safety.  In fact, the tear gas was launched upon the arrival of the gray truck with police lights, which, upon information and belief, was the command structure.  Pins had been pulled from tear gas cannisters prior to the arrival of the gray truck. The Richmond Police Department and the Mayor's office have subsequently recanted their initial, and false tweet by the Richmond Police Department regarding the necessity of gassing the assembly, now acknowledging that the members of the Police Department on the scene acted outside of written department protocols.

26.     At approximately 9:47 p.m., Richmond Police tweeted, "Chief Smith just reviewed video of gas being deployed by RPD officers near the Lee Monument and apologizes for this unwarranted action. These officers have been pulled from the field. They will be disciplined because their actions were outside dept protocols and directions given." **Exhibit 12.**

27.     The Mayor of Richmond has admitted that the actions "violated [the] rights" of those assembled.[2]

28.     In fact, and upon information and belief, the defendants were motivated by actual malice against the assembly, and/or desiring to exact revenge on the assembly at the General Robert E. Lee monument for the actions of previous separate protests, including the protests of Friday May 29, 2020, which saw the Richmond Police Department headquarters vandalized,

---

[2] **Statement by Mayor Levar Stoney, During Apology Speech, June 2, 2020, Noon, City Hall, Richmond Virginia.**

and/or desire to retaliate against the assembly due to the fact that the assembly was protesting police misconduct generally, and the misconduct of the Richmond Police Department, specifically.

29.     Plaintiffs Jarrod Blackwood and Megan Blackwood are husband and wife. Jarrod Blackwood moved to Richmond to attend law school in 2006, and has resided in the area since then. Megan Blackwood was born in the Richmond area and has resided in the area for most of her adult life. Megan Blackwood particularly has a history of active involvement in organizing protest activities directed against racial inequalities. They attended this event together to advocate against police violence. They intended to bring their 12-year-old son to the event to teach him the proper way to express himself through peaceful social protest. They joined the assembly at Monroe Park before it left for the Capitol. They saw the group actively self-policing to ensure that it remained nonviolent and nondestructive of property. They heard chants such as "What are we here for—Love!" to discourage violence and property destruction. They saw elements of the police escort, and Jarrod Blackwood even coordinated to assist the police escort at one point to allow a police vehicle to pass through the assembly as it marched. Throughout the course of the assembly, they witnessed no violence, no property destruction, and no threats of violence or property destruction by members of the assembly. At Lee Circle, they remained at the southern side until the police convoy arrived. Together they moved north. As the members of the Richmond Police Department deployed with arms and armor, Megan Blackwood, who had been taught that officers are less likely to fire unjustly on a crowd that is led by white allies, pushed her way through the crowd to get to the front, and she raised her hands, to place herself between the police and others in the assembly. The Blackwoods were on the north-northwest portion of Lee Circle. **Exhibit 13.** They both saw officers with weapons trained on the assembly,

with gas masks and armor. Seeing how the officers were escalating the situation, Megan Blackwood expected to hear the officers give directions for the assembly to disperse, or to give warnings that tear gas was about to be used, but no warnings came. As the officers launched the initial tear gas, Jarrod Blackwood recalls looking at his watch and seeing that it was 7:34 p.m, He began shouting to the police with words to the effect that "It is 7:34! The curfew does not begin until 8! What you are doing is illegal!" He shouted to the others in the assembly not to leave, because they had a right to be there. He was prepared to remain and suffer injury or arrest to stand on his rights, but Megan Blackwood persuaded him, that for the sake of their son, they should retreat and break off their First Amendment activity. They both feared that they were going to be subjected to harmful and offensive contact by the officers. Fortunately, they escaped without suffering adverse physical contact, though they were angered and upset by the incident and the violation of their rights, they feared harmful contact, and they no longer feel inclined to encourage their son to participate in such peaceful protests, for fear of his safety and well-being.

30.     Plaintiff Ryan Tagg is 36 years old and has been a resident of Richmond for several years. He has been passionate about civil rights and felt that it was an important time to stand up and participate in these protests. He joined the assembly at Monroe Park, before it proceeded to the Capitol, and stayed with it to Lee Circle. He recalls seeing the police blocking roads to escort the assembly. He recalls hearing the organizers adamantly discourage any violence and property damage. Throughout the course of the assembly, he witnessed no violence, no property destruction, and no threats of violence or property destruction by members of the assembly. At Lee Circle, he remained at the near the edge of the crowd until the police arrived. As the police deployed, he moved into the assembly line, on the north-northwest portion of the circle, and he knelt and raised his hands. **Exhibit 13.** As the police deployed tear gas, he heard

someone yell from among the assembly not to disperse, that the assembly had a right to be where they were. He realized this was correct, and he determined to remain as others in the assembly line retreated. As more tear gas was launched, he felt its effects, as it began to burn his eyes and mouth. Only then did he decide to break off the exercise of his First Amendment activities. He was among the last two in his section of the line to retreat, as the police began to advance through Lee Circle. He feared that he was about to be attacked or shot, and the thought crossed his mind that the best case scenario would be that he would merely be arrested. He shouted back to the police in the vicinity words to the effect of "I am leaving. Don't shoot me in the back." Near the edge of Lee Circle, he glanced in the direction of one officer and saw the officer jog to close the distance, and then, at close range, fired OC pepper spray into Tagg's face. Tagg was blinded and felt his skin, eyes, nose, mouth and lungs burn, causing coughing and difficulty breathing. He instinctively attempted to rub his eyes and face to clear them, which only made them burn worse. The mucus of his sinuses ran free, and he was prevented by the pain from attempting to wipe it away. He stumbled blindly across the street, fearing that he would be attacked again or hit by a car, with the thought that he had to escape and then get indoors by 8 p.m. or the officers could attack him again. **Exhibit 5:13-5:27.** The sensation of burning continued for some time before he was able to sit down or to focus on what others were saying or doing. When he took a shower, the chemical irritant ran off his body carried by the water, burning as it went. His skin continued to burn for several days when he showered, and he suffered from sleeplessness that forced him to take time off of work, causing him economic losses.

31.     Plaintiff Christopher Gayler is 32 years old and has been a resident of the Richmond area for fifteen years. He participated in the protest because of his outrage at the

Floyd murder, and because of the unjust scale and brutality of police responses to earlier protests, both in Richmond and across the nation. He wanted to lend his voice to a movement that was right and just. He joined the assembly, with a friend, at Monroe Park as the assembly returned from the Capitol. He was near the front of the assembly as it proceeded to Lee Circle. He heard chants of "peaceful protest" from the assembly and saw the police escort. He witnessed the apparent organizers reiterate the need for a peaceful assembly. Throughout the course of the assembly, he witnessed no violence, no property destruction, and no threats of violence or property destruction by members of the assembly. At the Lee Memorial, he witnessed the convoy of police arrive and saw the skirmish line form. He was at the north-northeast portion of Lee Circle. As he recalls, he saw three officers train their weapons on the assembly—two with assault rifles, and one with a handgun. It appeared to him that these officers were not exercising good trigger discipline, and he feared that they would accidentally or intentionally fire, and cause other police to react. He therefore feared an imminent injury. He recorded a brief video, which is **Exhibit 8**. He used his phone to start recording, and he saw the armored vehicle approach. This video is **Exhibit 9.** He noticed the officers disembark from that vehicle and saw officers donning gas masks. He feared that the officers were preparing to use tear gas, and he feared that it would cause him injury. Very soon after, he saw the grey pickup truck arrive and stop next to the police. The police started firing tear gas. He took a respirator-style mask he had with him and gave it to his friend, and he exchanged his surgical mask with a bandana that he thought would provide better protection. As the tear gas was deployed, Gayler moved to the street, and he began recording again. He saw, and the video records, that a tear gas canister was launched in his direction, landing near him. This is **Exhibit 10**. Almost immediately, he felt the effects: burning eyes, nose, throat, and lungs, with coughing, gaging, and difficulty breathing. This cause him to

break off the exercise of his First Amendment rights. In fear of his safety, and the safety of those he was with, he discontinued recording and fled along Allen Street to Broad Street. He had the impression, as he fled, that he was being pursued by the police. After separating himself from the police, he put water on his mask in an attempt to reduce the continued effect of the gas, but that only exacerbated the effects.

32.     Keenan Angel is 26 and is has been a resident of Richmond for several years. He has been active in several peaceful protests in response to the George Floyd murder. He is biracial and has felt the effects of racism. He joined the assembly as it approached Monroe Park, coming from the Capitol. He witnessed the police escort, and he heard the other protesters and apparent organizers instructing the assembly to remain peaceful and nonviolent. At the Lee Memorial, he recalls seeing the police convoy approach and the officers deploy. He saw members of the police train their weapons on the assembly, and he feared they were about to fire. He took a position immediately in front of the memorial, kneeling with his hands raised, chanting with others "Hands up, don't shoot." **Exhibit 5, 13.** When the first tear gas was deployed, he determined to remain, but as more tear gas was used, he felt its effects, burning his skin, eyes and mouth. This caused him to break off his First Amendment Rights. He grabbed his friend who was with him and tried to lead her away, as she seemed to be blinded. He felt fear and remembers hundreds of panicked people trying to retreat and figure out what to do. His eye swelled up due to the chemical irritant, and he was forced to take time off of work.

33.     The exhibits referenced herein are incorporated herein.

## CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF THE FIRST AMENDMENT
**Seeking Declaratory Relief, and Compensatory and Punitive Damages**
**All Plaintiffs severally and/or as class members**
**Against all Defendants, jointly and/or severally**

34.    Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

35.    42 U.S.C. § 1983 provides, in pertinent part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

36.    Each of the plaintiffs, and each members of the class, is a "citizen of the United States or other person within the jurisdiction thereof." Does 1-X are "persons" for the purpose of 42 U.S.C. § 1983.

37.    The Plaintiffs, and the members in their class, were present at Lee Circle to engage in expressive activity, protected by under the First Amendment of the United States Constitution, which was made applicable to the states by the Fourteenth Amendment, in a traditional public forum.

38.    Does 1-X, at all relevant times herein, were acting under the color of state law.

39.    At the time of the events complained of herein, the Plaintiffs had a clearly established constitutional rights under the First Amendments of the United States Constitution, as applied to the states under the Fourteenth Amendment, to peaceably assemble and to engage in expressive activities, without retaliation by the police through a use of force or through

conduct that intimated the threat of an imminent use of force, other than force for purpose of making an arrest supported by probable cause.

40.     Furthermore, supervisors and other agents of the Richmond Police Department who planned, authorized, ratified, or condoned the conduct described herein are equally liable as those participating in this conduct; as are officers, agents, or employees of the Richmond Police Department who had actual or constructive knowledge that others were, or were intending, to engage in conduct that poses a pervasive and unreasonable risk of constitutional injury to citizens, and whose response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the conduct, which inaction was an affirmative cause of the constitutional injury.

41.     Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions surrounding the First Amendments case law concerning these rights at the time of the events complained of herein (as the law was clearly established at that time),that his or her conduct violated the Plaintiffs clearly established First Amendment rights.  Therefore, Does 1-X are not entitled to qualified immunity.

42.     The acts of Does 1-X, as described herein, involved the use of force and conduct that intimated the threat of an imminent use of force, for purposes other than making an arrest supported by probable cause, in retaliation for protected First Amendment activity.

43.     A similarly situated reasonable person would have been deterred in the exercise of their First Amendment activity by the conduct of the Doe defendants. In fact, the Plaintiffs were each deterred in their exercise of their First Amendment activity. This is evidenced by the dispersal of the Plaintiffs from the assembly, and the dispersal of the assembly generally as a result of the conduct of the Does.

44.     Does 1-X's actions were intentionally, willfully and wantonly in gross and reckless disregard of the Plaintiff's rights.

45.     Declaratory judgment that the conduct of the Defendants violated the First Amendment rights of the Plaintiffs and similarly situated individuals is appropriate.

46.     Compensatory damages are appropriate inter alia for the physical and emotional injuries, and the chilling effect of the defendants' conduct, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiffs as a direct and proximate result of the Defendant's conduct in violation of the Plaintiff's First Amendment rights.

47.     Punitive damages may be appropriate as to all or some of the Defendants, as the conduct of at least some of the defendants showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiffs' rights.

48.     An award of costs and attorney fees, pursuant to 42 U.S.C. § 1983, is appropriate.

49.     As the Supreme Court of the United States has opined, "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen and thus be less likely to respond belligerently to fighting words" even in the midst of a an assembly whose grievances are directed at their actions.

### COUNT II – VIOLATION OF THE FOURTEENTH AMENDMENT
**Seeking Declaratory Relief, and Compensatory and Punitive Damages**
**Subclass I Plaintiffs severally and/or as class members**
**Against all appropriate Defendants, jointly and/or severally**

50.     Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

51.     42 U.S.C. § 1983 provides, in pertinent part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the

jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

52.     Each of the plaintiffs, and each members of the class, is a "citizen of the United States or other person within the jurisdiction thereof." Does 1-X are "persons" for the purpose of 42 U.S.C. § 1983.

53.     Does 1-X, at all relevant times herein, were acting under the color of state law.

54.     At the time of the events complained of herein, the Plaintiffs had a clearly established constitutional rights under the Fourteenth Amendment of the United States Constitution, to be free of arbitrary state actor conduct that deprives an individual of bodily integrity. *Doe v. Rosa*, 795 F.3d 429, 436-37 (4th Cir. 2015). Under the circumstances, the use of tear gas, OC pepper spray, batons, and the like constitute an invasion of bodily security through a "means so brutal, demeaning, and harmful" as to be shocking to the conscience. *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980).

55.     Furthermore, supervisors and other agents of the Richmond Police Department who planned, authorized, ratified, or condoned the conduct described herein are equally liable as those participating in this conduct; as are officers, agents, or employees of the Richmond Police Department who had actual or constructive knowledge that others were, or were intending, to engage in conduct that poses a pervasive and unreasonable risk of constitutional injury to citizens, and whose response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the conduct, which inaction was an affirmative cause of the constitutional injury.

56.     Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions surrounding the Fourteenth Amendment

case law concerning these rights at the time of the events complained of herein, as the law was clearly established at that time, that their conduct violated the Plaintiffs clearly established Fourteenth Amendment rights.  Therefore, Does 1-X are not entitled to qualified immunity.

57.     The acts of Does 1-X, as described herein, involved the use of arbitrary state actor conduct that deprived the members of Subclass I of their right to bodily integrity. Under the circumstances, the use of tear gas, OC pepper spray, batons, and the like constitute an invasion of bodily security through a "means so brutal, demeaning, and harmful" as to be shocking to the conscience.

58.     Does 1-X's actions were intentionally, willfully and wantonly, in gross and reckless disregard of the Plaintiff's rights.

59.     Declaratory judgment that the conduct of the Defendants violated the Fourteenth Amendment rights of the Plaintiffs and similarly situated individuals is appropriate.

60.     Compensatory damages are appropriate inter alia for the physical and emotional injuries, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiffs as a direct and proximate result of the Defendant's conduct in violation of the Plaintiff's First Amendment rights.

61.     Punitive damages may be appropriate as to all or some of the Defendants, as the conduct of at least some of the defendants showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiffs' rights.

62.     An award of costs and attorney fees, pursuant to 42 U.S.C. § 1983, is appropriate.

## COUNT III – VIOLATION OF THE FOURTH AMENDMENT
**Seeking Declaratory Relief, and Compensatory and Punitive Damages**
**Subclass I Plaintiffs severally and/or as class members**
**Against all appropriate Defendants, jointly and/or severally**

63.     Plaintiff repeats and re-alleges the allegations set forth in the preceding

paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

64.     This is a Fourth Amendment excessive force claim. It is pled on the belief that

some of the unknown defendants may attempt to justify their conduct as an attempt to arrest or

detain individuals, or otherwise in a manner that brings the use of force within the parameters of

the Fourth Amendment, rather than the Fourteenth Amendment directly.

65.     42 U.S.C. § 1983 provides, in pertinent part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress.

66.     Each of the plaintiffs, and each members of the class, is a "citizen of the United

States or other person within the jurisdiction thereof." Does 1-X are "persons" for the purpose of

42 U.S.C. § 1983.

67.     Does 1-X, at all relevant times herein, were acting under the color of state law.

68.     At the time of the events complained of herein, the Plaintiffs had clearly

established constitutional rights under the Fourth Amendment of the United States Constitution,

to free of arrest without probable cause, and to be free of the use of excessive force in the attempt

to execute and arrest or detention.

69.     Furthermore, supervisors and other agents of the Richmond Police Department

who planned, authorized, ratified, or condoned the conduct described herein are equally liable as

those participating in this conduct; as are officers, agents, or employees of the Richmond Police Department who had actual or constructive knowledge that others were, or were intending, to engage in conduct that poses a pervasive and unreasonable risk of constitutional injury to citizens, and whose response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the conduct, which inaction was an affirmative cause of the constitutional injury.

70.     Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions surrounding the Fourth Amendment case law concerning these rights at the time of the events complained of herein (as the law was clearly established at that time), that their conduct violated the Plaintiffs clearly established Fourteenth Amendment rights.  Therefore, Does 1-X are not entitled to qualified immunity.

71.     To the extent that the acts of Does 1-X, as described herein, fall within the parameters of the Fourth Amendment, the conduct of all or some of the Does 1-X involved the unlawful use of force in an attempt to arrest without probable cause, or otherwise excessive force to make a lawful arrest, as to the members of Subclass 1.

72.     The assembly was peaceful and lawful, and it was even conducted under police escort. There was no probable cause for arrest.

73.     To the extent that the defendants believed that there was cause for arrest, it is averred that the force used exceeded the force that was objectively unreasonable. For instance, any offense that was supported by believe of probable cause was a minor offense; the assembly, being without obvious weapons of significance, and having demonstrated its peaceful intent, even to the point of many with their arms raised, were not a meaningful threat against heavily armed, body armor clad, gas masked wearing officers; the assembly was not actively resisting

arrest, and there were multiple heavily armed officers and the SWAT team present at the time the Defendants decided to use force .

74.     Does 1-X's actions were intentionally, willfully and wantonly in gross and reckless disregard of the Plaintiff's rights.

75.     Declaratory judgment that the conduct of the Defendants violated the Fourth Amendment rights of the Plaintiffs and similarly situated individuals is appropriate.

76.     Compensatory damages are appropriate inter alia for the physical and emotional injuries, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiffs as a direct and proximate result of the Defendant's conduct in violation of the Plaintiff's Fourth Amendment rights.

77.     Punitive damages may be appropriate as to all or some of the Defendants, as the conduct of at least some of the defendants showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiffs' rights.

78.     An award of costs and attorney fees, pursuant to 42 U.S.C. § 1983, is appropriate.

### COUNT IV – ASSAULT
**Seeking Compensatory and Punitive Damages**
**All Plaintiffs severally and/or as class members**
**Against all appropriate Defendants, jointly and/or severally**

79.     Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

80.     The intentional acts of violence and intentional actions intimating threats of violence by the defendants, to include training firearms on the peaceful assembly, the use of tear gas, the use of OC pepper spray and batons, and the armed and aggressive march through the grounds of the assembly, reasonably put the Plaintiffs in fear of an imminent, harmful or offensive touching, without justification or excuse.

81. Those defendants that were present and encouraged the assault are equally liable for the assault.

82. Those defendants that were not present, but who planned, authorized, ratified, or condoned the assault are equally liable for the assault.

83. Any actions taken by the Plaintiffs, or similarly situated individuals, such as tossing the tear gas cannisters back, was reasonable self defense or defense of others, as the actions were taken in response to an unprovoked assault or battery, and the conduct of the defendant was not supported by probable cause.

84. To the extent the officers were trying to conduct an arrest or arrests, the arrests lacked probable cause, or in the alternative, the force was unreasonable for making the arrest.

85. The defendants are liable to the Plaintiffs, and similarly situated individuals for assault. Compensatory damages for the pain, suffering, and out of the pocket expenses and lost wages is appropriate.

86. An award of punitive damages, as to some or all of the officers, is also appropriate, as the defendants acted with a sinister or corrupt motive such as hatred, personal spite, ill will, or a desire to injure the plaintiffs, or acted under circumstances amounting to a willful and wanton disregard of the plaintiffs' rights.

87. An award of costs is also appropriate.

### COUNT V – Battery
### Seeking Compensatory and Punitive Damages
### Subclass I Plaintiffs severally and/or as class members
### Against all appropriate Defendants, jointly and/or severally

88. Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

89.     The intentional acts of violence, to include the use of tear gas and the use of OC pepper spray and batons, caused harmful and offensive touching of the Subclass I plaintiffs.

90.     Those defendants that were present and encouraged the assault are equally liable for the battery.

91.     Those defendants that were not present, but who planned, authorized, ratified, or condoned the assault are equally liable for the battery.

92.     Any actions taken by the Plaintiffs, or similarly situated individuals, such as tossing the tear gas cannisters back, was reasonable self-defense or defense of others, as the actions were taken in response to an unprovoked assault or battery, and the conduct of the defendant was not supported by probable cause.

93.     To the extent the officers were trying to conduct an arrest or arrests, the arrests lacked probable cause, or in the alternative, the force was unreasonable for making the arrest.

94.     The defendants are liable to the Plaintiffs, and similarly situated individuals for battery. Compensatory damages for the pain, suffering, and out of the pocket expenses and lost income is appropriate.

95.     An award of punitive damages, as to some or all of the officers, is also appropriate, as the defendants acted with a sinister or corrupt motive such as hatred, personal spite, ill will, or a desire to injure the plaintiffs, or acted under circumstances amounting to a willful and wanton disregard of the plaintiffs' rights.

96.     An award of costs is also appropriate.

**COUNT VI – Gross Negligence**
**Seeking Compensatory and Punitive Damages**
**Subclass I Plaintiffs severally and/or as class members**
**Against all appropriate Defendants, jointly and/or severally**

97.     Plaintiff repeats and re-alleges the allegations set forth in the preceding

paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

98.     Though Virginia law holds civilians that engage in inherently dangerous activities

strictly liable for any injuries they cause, it exempts police from this high standard—even when

the police force is armed and armored, with assault weapons, other firearms, an armored vehicle,

tear gas cannisters, OC pepper spray, and other weapons, deploying en masse against peaceful

demonstrators. Instead, the police are only required, under the common law of the

Commonwealth of Virginia, to exercise slight care—that is, they are only liable for gross

negligence, which is acting consciously in disregard of another person's rights or acting with a

reckless indifference to the consequences to another person when the defendant is aware of his

conduct and is also aware, from his knowledge of existing circumstances and conditions, that his

conduct would probably result in injury to another.

99.     This police force strode into a peaceful protest and unilaterally pushed it to the

precipice of violence. Specifically, this police force arrived, and, without cause or warning,

deployed en masse, with arms and armor, in a battle line, so as to use military tactics, doctrine,

and equipment that were designed and developed for use in combat operations against America's

enemies on foreign shores, but were instead being turned here, in Lee Circle, against an assembly

of U.S. citizens, including men, women, children—families of all races—who gathered here in

Richmond, Virginia, to peaceably protest police violence. At that time, and in that place,

members of this police force were ready and willing to join, at the slightest sign of aggression by

one of their own, in an overwhelming, disproportionate, coordinated act of violence against the

protesters, without regard to the justice or legality of their individual or collection actions. These members of the police force understood that the force they and their unit would deploy would probably injure protesters.

100.     By arriving and deploying as they did, with so many members of this police force ready and willing to use such violence, even without specific knowledge that would justify the individual's use of such violence, these officers were acting with a reckless indifference to the consequences their own actions would have on the protesters. Each was aware of his own conduct—one only had to look around and see it—and each that launched tear gas, or used OC spray, or used their batons or other weapons was aware that his conduct would probably result in injury to another.

101.     This police force acted as it did despite the extraordinary efforts of the protesters to keep the assembly peaceable. This police force acted as it did despite the respect the protesters had shown toward the law, toward all persons they had encountered, and to private and public property. This police force acted as it did despite men and women kneeling on the ground before them, with hands raised over their heads, chanting "Hands up, don't shoot." This police force acted without warning, provocation, or need. To quote the Fourth Circuit, "This has to stop."[3]

102.     This police force took a peaceful protest to the precipice of violence and did not stop. This police force responded to an unjustified act of aggression by one of their own, and joined together in the use of violence against the protesters, without knowledge of any facts or circumstances justifying their individual conduct. This was gross negligence.

---

[3] *Estate of Jones v. City of Marinsburg*, Case No. 18-2142 (4th Cir.) (Amend. Op. of 06/10/2020)

103.   The defendants are liable to the Plaintiffs that suffered physical injuries, and similarly situated individuals, for gross negligence. Compensatory damages for the pain, suffering, and out of the pocket expenses and lost income is appropriate.

104.   As this conduct shows willful and wanton disregard of the Plaintiffs' rights, an award of punitive damages is appropriate.

## PRAYER FOR RELIEF

**WHEREFORE,** the above premises considered, Plaintiff respectfully prays that this Honorable Court:

A.   Enter an order certifying the class and each sub-class defined herein pursuant to Federal Rules of Civil Procedure Rule 23(b)(1), (2) and (3);

B.   Enter declaratory judgment that the Defendants' actions violated the Constitutional of Plaintiffs and the class members, as detailed herein;

C.   General and compensatory damages for Plaintiffs and the class they represent for the violations of their federal constitutional and statutory rights and Virginia law, for pain and suffering, for out of the pocket expenses, all to be determined according to proof;

D.   An award of attorneys' fees pursuant to 42 U.S.C. § 1988;

E.   Costs of suit;

F.   Pre- and post-judgment interest as permitted by law;

G.   Such other and further relief as the Court may deem just and proper.

Plaintiff demands a trial by jury on all issues so triable herein.

**Respectfully submitted,**
**Plaintiffs Jarrod Blackwood, Megan Blackwood,**
**Ryan Tagg, Christopher Gayler, and Keenan**
**Angel, by counsel, each individually and on**
**behalf of a class of similarly situated persons**


By: _/s/ Andrew T. Bodoh_____
                   Counsel

Thomas H. Roberts, Esq. VSB # 26014
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. VSB # 80143
andrew.bodoh@robertslaw.org
Thomas H. Roberts & Associates, P.C.
105 South 1st Street
Richmond, VA 23219
(804) 783-2000 (telephone)
(804) 783-2105 (facsimile)
*Counsel for Plaintiffs*